IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KRISTINA LEONARD, individually, :
and as executrix of the Estate :
of Paul P. Leonard, deceased, :
and as guardian of Casey :
Leonard, a minor, :
        Plaintiff, :
     v. : Case No. 3:04-cv-254-KRG-KAP
COOPER INDUSTRIES, LTD., COOPER :
TOOLS, INC., COOPER HANDTOOLS, :
COOPER TOOLS, INC., a division :
of Cooper Industries, Ltd., and :
COOPER HANDTOOLS, a division of :
Cooper Industries, Ltd., :
        Defendants :

## Report and Recommendation

### Recommendation

This is a wrongful death and survivor action arising from the fatal injury suffered by Paul Leonard at his workplace, the Altoona Pipe and Steel Company, on July 10, 2002. Plaintiff's complaint, removed from state court by defendants, alleges that a plate clamp manufactured by defendant caused the injury to Leonard, and states a strict liability claim that the clamp was defectively designed, a negligence claim that the clamp was negligently designed, and a breach of warranty claim that the clamp was not merchantable. After discovery, defendants filed a motion for summary judgment on all three claims. docket no. 20. Summary judgment should be granted as to the strict liability and breach of warranty claims; the negligence claim should proceed to jury trial.

Report

The relevant parts of the record are not in dispute even though the characterization of the record is. Leonard was thirty years old and was working as a painter at the Altoona Pipe and Steel Company building in Altoona, when his job called for him to help Jason Yon, a crane operator, move a five ton steel I-beam[1] so that it could be painted. The beam was resting on two supports keeping the beam off the ground, and Leonard wrapped metal chains around the beam, one at each end of the beam. Attached to each of the chains was a clamp manufactured by defendant. It appears that a clamp fastens to the flange of an I beam and is used when it is desired to move a beam from horizontal to vertical or to turn it over while handling it. (Pictures appear in the record at docket no. 26-2 at 4 and at docket no. 26-4 at 9.) Probably because no such complicated motion was called for, at the time of the accident the clamps were not being used to lift the beam: as was common practice, Leonard simply wrapped each chain around the bean and secured it with a choker. The clamps were left on the chains,

---

1. The dimensions of the beam are not in the record, and there is some confusion in the record about the parts of an I-beam. A horizontal support such as a lintel or girder which is fixed at the ends and has a load placed on it between those ends is subject to compression at the top of the support and is in tension at the bottom; other things being equal, the greater the distance between top and bottom, the stronger the support. In an I-beam, the piece creating this vertical distance is called the web, and the top and bottom are called flanges, not phalanges, which are bones in the fingers.

2

below the level of the beam. It is not clear what the signaling procedure was or what safety rules were in effect at the workplace to ensure that Leonard was clear of the beam before the lift, but as Yon began lifting the beam with the crane, Leonard was heading toward one end of the beam being lifted and walking in a narrow space between other beams not being lifted. The shoulder[2] of the clamp, as it came up, caught the flange of a stationary I-beam, applying torque to the beam being lifted. When the chain rose a little higher, the shoulder of the clamp slipped off the beam on which it had caught. This caused the beam being lifted to swing back, striking Leonard in the head and fatally crushing him against another stationary beam.

As can be seen from the pictures of the clamps in the record, there are other designs for a clamp. One option is to have the shoulders either rounded or guarded as in the clamp pictured at docket no. 26-2. Plaintiff's expert opines that the rounded design and the guard would have reduced or prevented the risk that

---

2. Because a clamp is a three dimensional device, when it is being lifted vertically it has two "shoulders" which can catch on objects, a broad shoulder perpendicular both to the direction of motion and to the plate it would secure, and a narrow shoulder parallel to any plate it would secure. Rounding the broad shoulder of the clamp would not prevent the clamp from catching a projection on the narrow shoulder, and the narrow shoulder as a practical matter cannot be rounded, so that risk is addressed by attaching a downward facing Y shaped guard just above the narrow shoulder to deflect objects away. Again, the pictures are worth a hundred words. Because no one actually witnessed the accident it is not clear which shoulder of the defendant's clamp caught the beam, but defendant's design used neither safeguard.

3

a clamp will catch on other projections in the workplace. docket no. 26-2.

Plaintiff's three claims all rely on the same factual premise, that a differently designed clamp would not have caught on the stationary I-beam. Plaintiff concludes that because the defendants' clamp had square shoulders and no guard it was a defectively designed product, that defendants were negligent in designing it, and that the clamp breached the warranty of merchantability.

Standard for summary judgment

Federal Rule of Civil Procedure 56(c) requires the entry of summary judgment ". . . if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-248 (1986). (emphasis in original).

What facts are material defends on the substantive law: a fact is material if proof of its existence or non-existence "might affect the outcome of the suit under the governing law...." <u>Anderson</u>, 477 U.S. at 248. An issue of material fact is "genuine" if the evidence is such that a jury properly instructed as to the

substantive law might return a verdict for the non-moving party. Anderson, 477 U.S. at 257.

The moving party is not required to refute the affirmative elements of the nonmoving party's claims or defenses: it need only point out the absence or insufficiency of evidence to the affirmative elements the nonmoving party must prove. Houser v. Fox Theatres Management Corp., 845 F.2d 1225, 1229 (3d Cir.1988). Once the moving party has satisfied its burden of identifying evidence which demonstrates the absence of a genuine issue of material fact, the non-moving party is required to go beyond the pleadings by way of affidavits, depositions, answers to interrogatories, etc., in order to demonstrate specific facts which give rise to a genuine issue. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). When Rule 56(e) shifts the burden of proof to the non-moving party, that party must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial. Equimark Commercial Finance Co. v. C.I.T. Financial Services Corp., 812 F.2d 141, 144 (3d Cir. 1987).

Strict liability

Section 402A of the Restatement (2d) of Torts provides:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
(a) the seller is engaged in the business of selling such a product, and
(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

5

(2) The rule stated in Subsection (1) applies although
(a) the seller has exercised all possible care in the preparation and sale of his product, and
(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Pennsylvania, which provides the controlling substantive law in this suit, has adopted the doctrine of strict products liability as set forth in the Restatement. Webb v. Zern, 422 Pa. 424, 220 A.2d 853 (1966); Petree v. Victor Fluid Power, Inc., 831 F.2d 1191, 1194 (3d Cir.1987), after remand, 887 F.2d 34 (3d Cir.1989); Girard v. Allis Chalmers Corp., 787 F.Supp. 482 (W.D.Pa.1992), and Brantner v. Black & Decker Mfg. Co., 831 F.Supp. 460 (W.D.Pa.1993). Although a manufacturer is not "the guarantor of his products' safety," Azzarello v. Black Bros. Co., 480 Pa. 547, 391 A.2d 1020, 1023 (1978), quoting Salvador v. Atlantic Steel Boiler Co., 457 Pa. 24, 319 A.2d 903, 907 (1974), if a manufacturer designs or produces, or a distributor markets a defective product, it is liable for injury arising from its use despite the unforeseeability of that defect. See Habecker v. Clark Equipment Co., 942 F.2d 210, 215 (3d Cir.1991). The key idea here is "use": a manufacturer is strictly liable only for defects affecting the safety of the product for its intended use by its intended user. Phillips v. Cricket Lighters, 576 Pa. 644, 841 A.2d 1000 (2003), appeal after remand, 584 Pa. 179, 883 A.2d 439 (2005); Griggs v. BIC Corp., 981 F.2d 1429 (3d Cir.1992).

The leading case on intended use and intended user is Phillips, in which the Pennsylvania Supreme Court rejected a strict liability claim for injuries caused by a two year old who started a fire with a disposable lighter not equipped with any childproof features. On the first appeal of the matter to the Pennsylvania Supreme Court, that court held that a strict liability claim was precluded because lighters were designed for use by adults, not children. Expressly linking the concepts of foreseeable use and foreseeable user, the court held that the foreseeability of misuse of lighters by a child was a basis for sending the negligence claim to trial, but that there is no strict liability for non-intended uses.

Even more recently, Pennsylvania Department of General Services v. U.S. Mineral Products Co., 587 Pa. 236, 898 A.2d 590, 600 (2006), reversed and remanded for new trial a verdict against Monsanto Corporation on a strict liability claim that its building products containing PCBs had contaminated a government building which had caught on fire. Applying Phillips, the court distinguished between a permissible claim for PCB contamination - that Monsanto's products were defective because they off-gassed PCBs - and an impermissible claim - that the building products were defective because they contained PCBs which were susceptible to spreading when the building caught on fire - by explaining that because the building products were not intended to be incinerated

7

there was no strict liability for the latter type of contamination. 898 A.2d at 604. The court specifically rejected the claim that because it was foreseeable that the building products would be exposed to fire, any resulting contamination should be brought within the products' intended use, calling that position an "awkward one." 898 A.2d at 602 n.14.

The issue here is conceptually different from that in Phillips (centering as it does on intended use versus intended user), but very similar to the one in Pennsylvania Department of General Services, which applied Phillips. The following simple syllogism applies: (major premise) the clamp was not in use at the time of the accident; (minor premise) intended use, which is necessary for strict liability, is a subset of all use of a product; (conclusion) the clamp was not being put to its intended use at the time of the accident. This means the clamp could not, as a matter of law, be defective. Just as they could not be strictly liable for an injury caused by a person tripping over a clamp, defendants cannot be strictly liable here. Defendants' implicit definition of "in use" is perhaps too narrow, but they are correct in their basic point that strict liability's use requirement is not satisfied by the mere presence of their product at the scene of the accident, nor by its use on other occasions or for other purposes. As Pennsylvania Department of General Services shows, Pennsylvania excludes from the realm of strict liability

those damages that arise from foreseeable consequences of non-intended uses. And mere presence of the defendants' clamps at the time of the accident and use on other occasions is all that the record shows.

Plaintiff argues that the record does not support summary judgment because there is an issue of fact as to whether the clamps were in use. Plaintiff asserts that "One of Paul Leonard's co-workers, Edward Bailey, specifically testified that the plate clamp was where it should have been and was being used for a specific purpose at the time of the accident (see Exhibit F p.s. 49-50)." docket no. 26 at 8. Plaintiff further asserts that Jason Yon, the crane operator, testified that before using the chains to secure the I-beam Leonard had tried to use the clamp on the I-beam. docket no. 26 at 8-9, citing docket no. 26-4 at 3-4.

To address the impact of Yon's testimony first, if Yon actually testified as plaintiff characterizes his testimony, it would show not that the clamp was in use at the time of the accident but rather the opposite, that Leonard or Yon (or both) had decided **not** to use the clamps at the time of the accident. The defect (in the colloquial sense) that would be relevant would be that the clamp was not suitable for moving the I-beam, not that it had an unsafe design. Defendants could not be responsible for the consequences of the decision by Leonard or Yon not to use their product but nevertheless leave it on the chains.

9

Even if Yon's testimony supported a finding that Leonard had tried to use the clamps, his testimony shows that the alleged design defect had nothing to do with that decision. The deposition testimony, in relevant part, docket no. 26-4 at 3-4, was:

Q. Now, is it your testimony that there were only two grabs in the whole facility?
A. I can't say in the whole facility but I can say that hung on the chains at all times.
Q. Now once it was determined that the grab[3] is it grab or grabbers or does it not matter?
A. Grabs it[']s called grabs.
Q. Once it was determined that the grabs did not fit strike that. Paul had to remove the grabs from the chain in order to determine whether or not they fit, is that right?
A. No. I just lowered the chains down and they wouldn['] t slide over the top so you unhook the hooks, you know, the end of the chains, then you could just wrap them around the beam instead of using the grabs.
Q. So it would be fair to say that the grabs were never physically removed from the chain to determine that they didn't fit?
A. No.  They were never removed from the chain but they were lowered down, I lowered them down to see if they would fit, but they wouldn['] t fit on it.

Yon did not see the accident itself, but discussed how he believed the accident happened based on the feel of the crane and the sound of the clamp catching on an I-beam. Counsel then came back to the issue of whether the clamps had been in use at the time of the accident, docket no. 26-4 at 7:

A. Just because of the way the grab snapped off, it made like a popping, a loud popping noise when it got caught, it popped out away from everything as the beam was falling forward.
Q. Would it also be consistent, the motion of the grabber, would it be consistent with not properly being attached?
A. What not being properly attached?

---

3.  There are typographical symbols here and throughout the transcript not edited out by the proofreader.  I omit them.

10

Q. The grabber.
A. I don't understand the question.

Again, because the clamps were not in use, Yon is puzzled and unable to respond when counsel asked a question assuming that the clamps were used.

The characterization of Bailey's testimony as supporting a claim that the clamps were being put to an intended use is 180 degrees contrary to Bailey's testimony. Bailey's deposition testimony, in relevant part, docket no. 26-7 at 3, was:

Q. Was the grab [the clamp] in use at the time of the accident?
A. **No.**
Q. It was hanging on the sling chain?
A. Uh huh(yes). Yes.
Q. Why was it hanging on the sling chain?
A. That's where it goes.
Q. Was it in operation at that time?
A. **No.** At what time?
Q. At the time of the accident, was it being used for some purpose at the time of the incident?
A. **Yes. We took the steeling off of my truck. And these go on the sling chain. Sometimes you don't use them. Sometimes you would wrap the chain around and choke it with the chain and use the hook.**
Q. Okay.
A. **But he was lifting ---- the chains come down through here like this. He was lifting these up and it caught the edge of the phalange [sic] of the beam and it flipped over on him.**

After Bailey had flatly stated twice that the clamp was not in use at the time of the accident his tangential answer to the question asked the third time (which for a third time made in clear the chains were used without the clamps) began with the word "yes." That does not create an issue of fact as to whether the clamp was

11

in use at the time. To the same effect, see the deposition testimony of Garth Freet at docket no. 26-11 at 3:

Q. Do you know whether or not the lift clamp was in use at the time of the incident?
A. Not really.

\*\*\*

Q. Do you know if it was actually in use when the incident happened?
A. I don't think so.

See also the deposition testimony of Timothy Clapper at docket no. 26-3 at 8:

Q. And the grabs that were, that you described, were they in use by either Paul or Jason at the time of the accident?
A. They weren't being used theirselves ...

Warranty of merchantability

The law governing plaintiff's breach of warranty of merchantability claim was addressed by the Pennsylvania Supreme Court in the second appearance of the Phillips non-childproof lighter case before it, Phillips v. Cricket Lighters, 584 Pa. 179, 883 A.2d 439 (2005). On interlocutory appeal by allowance, the Pennsylvania Supreme Court reversed the determination of the Pennsylvania Superior Court that a breach of warranty claim could go to the jury. Quoting the Uniform Commercial Code, 13 Pa.C.S.§ 3124, the court observed that merchantable meant "fit for the ordinary purposes for which such goods are used," and since the ordinary purpose of a lighter was to produce a useable flame, the lighter was merchantable. 883 A.2d at 444-45. Again, foreseeable

misuse made no difference to whether the product would function if used for its ordinary purpose.

In the present case, there is no evidence that the clamp malfunctioned in its ordinary use, because there is no evidence that it was in use at the time of the accident which killed Paul Leonard. There is no evidence that the clamp, if it were used as a clamp, would not function normally. There can be no breach of warranty claim.

Negligence

In <u>Metzgar v. Playskool, Inc.</u>, 30 F.3d 459 (3d Cir.1994) and in <u>Griggs v. BIC Corp.</u>, 981 F.2d 1429 (3d Cir.1992), the Court of Appeals reversed grants of summary judgment against plaintiffs' negligence claims. In <u>Metzgar</u>, a child had died after choking on a Playskool toy block his parents had allowed him to play with even though the child was younger than the age recommended by Playskool for use of the product; in <u>Griggs</u> (as in <u>Phillips</u>) a child had started a fire with a disposable lighter. The Court of Appeals in <u>Griggs</u> spelled out Pennsylvania negligence law:

Pennsylvania courts have set forth the elements of negligence as follows:
1) A duty or obligation recognized by the law, requiring the actor to conform to a certain standard of conduct for the protection of others against unreasonable risks;
2) A failure to conform to the standard required;
3) A causal connection between the conduct and the resulting injury; and
4) Actual loss or damage resulting to the interests of another.
<u>Morena v. South Hills Health Sys.</u>, 501 Pa. 634, 462 A.2d 680, 684 n.5 (1983) (citing William L. Prosser, <u>Law of Torts</u> §30, at 143 (4th ed. 1971); <u>Fennell v. Nationwide Mut. Fire Ins. Co.</u>, 412

Pa.Super. 534, 603 A.2d 1064, 1066-67 (1992). At issue in this aspect of the present case is the element of duty. Normally, "[t]he determination of what duty, if any, a defendant owes a potential plaintiffs is a question of law." Burton v. Terry, 140 Pa.Commw. 336, 592 A.2d 1380, 1383 (1991), appeal denied, 529 Pa. 665, 604 A.2d 1031 (1992).

981 F.2d at 1434. The dispositive question in the instant case is whether defendants owed any duty to Leonard in designing the clamps which allegedly contributed to the fatal accident. Griggs held that the existence of a common law duty is determined by whether the risks of injury from the defendant's conduct were foreseeable and whether those foreseeable risks were unreasonable. 981 F.2d at 1935. In Phillips, the Pennsylvania Supreme Court set out a more elaborate test which comes to the same thing:

To determine whether the defendant owed a duty of care, we must weigh the following five factors: "(1) the relationship between the parties; (2) the social utility of the [defendant's] conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the [defendant]; and (5) the overall public interest in the proposed solution.

841 A.2d at 1008 (citations omitted).

The key concept in determining duty under either formula is foreseeability[4]. As summarized by the Court of Appeals in

---

4. The second step in determining whether a negligence claim can be made out is to determine whether the foreseeable risk is an unreasonable one. Griggs, 981 F.2d at 1435. Phrased another way, "the actions of the defendant must be unreasonable, or expose the plaintiff to an elevated risk of foreseeable harm." Mohler v. Jeke, 407 Pa.Super. 478, 595 A.2d 1247, 1252 (1991). See also Mazzagatti v. Everingham, 512 Pa. 266, 516 A.2d 672 (1986). If the risk was foreseeable, because of the environment in which the clamp is in use, the harms at risk here were serious injury or death.

14

Kleinknecht v. Gettysburg College, 989 F.2d 1360, 1369 (3d Cir.1993):

The type of foreseeability that determines a duty of care, as opposed to proximate cause, is not dependent on the foreseeability of a specific event.

***

Only when even the general likelihood of some broadly definable class of events, of which the particular event that caused the plaintiff's injury is a subclass, is unforeseeable can a court hold as a matter of law that the defendant did not have a duty to the plaintiff to guard against that broad general class of risks within which the particular harm the plaintiff suffered befell. (citations omitted).

Metzgar made clear, in reversing this court's grant of summary judgment on the negligence claim despite the evidence that the Playskool product at issue had never been implicated in a choking injury, that the absence of any evidence of a history of precisely the same accident is not dispositive on the question of foreseeability so long as there is evidence of related accidents presenting the same kind of risks:

The fact that the Playskool purple half-column block has not been a contributor to the infant mortality rate until now may be simply happenstance from which we cannot conclude that the block will be safe for future reasonably foreseeable users.

30 F.3d at 462.

Defendants' duty under Fed.R.Civ.P. 56 is to come forward with some evidence that the decision to market the clamp was not unreasonable in light of the foreseeable risks, or to point out that there is no evidence that its decision was unreasonable. If defendants discharge that burden, the plaintiff must introduce sufficient

evidence of the elements of a negligence claim to allow a finding in their favor.

Given the breadth of foreseeability dictated by the opinion in Metzgar, defendants have not carried their initial burden of showing that the decision to market the clamp was not unreasonable. Counsel for defendants assert in the brief that "there is no evidence of accidents although this clamp has been in use for decades," and despite "thousands of applications" during the life of the clamps. docket no. 22 at 7. Statements by counsel of course are not evidence. But even if they served to trigger plaintiff's duty to come forward under Rule 56, plaintiffs produce evidence from Leonard's co-workers at this particular workplace that the risk of having this design of clamp catch on objects when the chains were used to lift objects was well known. See docket no. 26-11 at 3, deposition of Garth Freet:

Q. Did you ever see a lift clamp get caught on a steel beam when the sling chain was hoisting the beam or any other item?
A. I seen it, yeah, where it's like ... .

See also docket no. 26-3 at 11, deposition of Timothy Clapper, referring to "close calls" where the clamp would "catch for a second" but not result in an accidents.
Simply put, the record is too undeveloped as to the negligence claim for the court to rule as a matter of law on the question of foreseeability and therefore duty. The negligence claim should go forward to trial.

Pursuant to 28 U.S.C.§ 636(b)(1), the parties are given notice that they have ten days to serve and file written objections to this Report and Recommendation.

DATE: 11 February 2008

Keith A. Pesto,
United States Magistrate Judge

Notice by ECF to counsel of record